OPINION
{¶ 1} Appellant, Quentin Dillard, was convicted of nine felony offenses and accompanying firearm specifications and sentenced for these offenses in the Jefferson County Court of Common Pleas. He now appeals his convictions and sentencing.
 {¶ 2} Appellant's convictions stem from his participation in several unsuccessful robberies and a shooting spree. Appellant's accomplices, Eugenia Brown and Charles Miller, testified on the prosecution's behalf at his jury trial.
 {¶ 3} The facts of the offenses are as follows: On the night of April 24, 2003, Appellant handed Miller a shotgun, and told Miller he wanted to rob someone. (Tr. Vol. III, p. 571.) Appellant had a nine-millimeter handgun. (Tr. Vol. III, pp. 575-576, 587.)
 {¶ 4} Appellant then gave Brown crack cocaine and money to obtain a car. She gave the drugs to two individuals in exchange for the use of their car. They also gave her a hotel room key. When Brown returned to the house, Appellant told her to drive he and Miller to the Market Square Apartments. By now, it was approximately 2:30 a.m. on April 25, 2003. (Tr. Vol. II, p. 420, Vol. III, pp. 518, 578.)
 {¶ 5} Appellant and Miller went to the door of the apartment they thought belonged to Joseph Gomez, known as the "weed man." Miller was carrying the shotgun and Appellant had the nine-millimeter. Miller used Brown's jacket to cover up the shotgun. As the two were walking up the steps, Brown's jacket fell. It contained Brown's identification card and the hotel key. (Tr. Vol. II, pp. 431, 452, Vol. III, pp. 586-588.)
 {¶ 6} Appellant banged on the door. The apartment actually belonged to Brandi Beaver, Gomez's girlfriend and the mother of his baby. Appellant covered the peephole, and Miller advised Beaver that they were security. Appellant informed Beaver, "It's important. We need to talk to you." (Tr. Vol. III, pp. 589-590.)
 {¶ 7} She cracked open the door. Appellant stuck his gun through the aperture and kicked the door wide open. (Tr. Vol. I, p. 214, Vol. III, p. 591.) Appellant and Miller told Beaver to get on the floor, and asked for Gomez. (Tr. Vol. I, pp. 215-216.)
 {¶ 8} While Appellant and Miller were forcing their way into the apartment, Gomez jumped out of the bedroom window. (Tr. Vol. I, p. 274, Vol. III, p. 516.) He left Beaver, their baby, and Beaver's five-year old son in the apartment. (Tr. Vol. I, p. 217.)
 {¶ 9} Appellant told Beaver to, "Come up off the money", so she searched her apartment looking for something to give them. (Tr. Vol. I, p. 219.) At one point, Appellant kicked her when she tried to put on her pants, and then he slapped her in the face. (Tr. Vol. I, pp. 219-220.) Appellant and Miller left Beaver's apartment when they realized that Gomez jumped from the window.
 {¶ 10} While waiting in the car, Brown noticed two white males in the apartment parking lot. They were Daniel Kenefick, 16, and Raymond Burchfield, 22. The two had borrowed Kenefick's mother's car. Brown heard gunshots at about the same time Appellant and Miller exited the apartment building. One of the males had been shot. (Tr. Vol. I, p. 274, Vol. II, pp. 444-446, Vol. III, pp. 671, 673.)
 {¶ 11} According to Burchfield, he and Kenefick were near their car when he noticed Miller was standing in the parking lot pointing a shotgun at them. He told them to empty their pockets. As Appellant walked toward them, Brown's car pulled up. Miller shot Kenefick with the shotgun, and Burchfield ran into the apartment building. (Tr. Vol. I, pp. 279-285, 293, Vol. II, p. 486.)
 {¶ 12} Kenefick testified that Miller told them to empty their pockets. (Tr. Vol. III, pp. 653, 665.) The next thing Kenefick knew, a gun was fired from behind him; he had been shot in the leg. Miller then shot him in his abdomen with the shotgun. Kenefick had both shotgun and nine-millimeter wounds. (Tr. Vol. III, pp. 651-657.)
 {¶ 13} Miller testified that Appellant pointed his gun in Miller's face telling him to shoot Kenefick. Miller pulled the trigger trying to aim away from Kenefick, and the shotgun exploded. As they were leaving the scene, Appellant said he wanted to go back and "finish" Kenefick, but Brown kept driving. (Tr. Vol. III, pp. 596-598, 600-601.)
 {¶ 14} The Kenefick car had three bullet holes; the recovered fragments were consistent with nine-millimeter handgun ammunition. (Tr. Vol. I, p. 300, Vol. II, pp. 365-366, Vol. IV, p. 754.)
 {¶ 15} In addition, Gomez heard a gunshot while hiding behind the apartment building. He saw the flash of a handgun toward Beaver's apartment. A nine-millimeter bullet hole was later found in their apartment wall above the area where Beaver's five-year-old son was sleeping. (Tr. Vol. II, pp. 376-377, Vol. III, 517-518, 529, Vol. IV, p. 767.) The bullet traveled through Beaver's apartment's exterior wall and lodged in her interior wall. (Tr. Vol. IV, p. 707.)
 {¶ 16} Appellant later thought it was funny that someone had been shot. (Tr. Vol. III, p. 602.)
 {¶ 17} Appellant was subsequently charged and convicted on five first degree felonies and four second degree felonies consisting of aggravated burglary of Brandi Beaver, a first degree felony; felonious assault of Beaver, a second degree felony; aggravated robbery of Beaver, a first degree felony; aggravated robbery of Gomez, a first degree felony; the felonious assault of Kenefick, a second degree felony; the aggravated robbery of Kenefick, a first degree felony; felonious assault of Burchfield, a second degree felony; aggravated robbery of Burchfield, a first degree felony; and discharge of a firearm into Beaver's occupied habitation, a second degree felony. Each offense carried a gun specification under R.C. § 2941.145.
 {¶ 18} Appellant's first and third assigned errors on appeal assert that the trial court failed to grant a mistrial. For clarity, we will first address these assignments.
 {¶ 19} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v. Franklin
(1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1.
 {¶ 20} The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court. State v. Garner (1995),74 Ohio St.3d 49, 59, 656 N.E.2d 623. A trial court has broad discretion to admit or exclude evidence, and an appellate court should not disturb the exercise of that discretion unless the accused demonstrates that he or she has suffered material prejudice. State v. Sage (1987),31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343, citing State v. Long
(1978), 53 Ohio St.2d 91, 98, 7 O.O.3d 178, 372 N.E.2d 804.
 {¶ 21} Appellant's first assignment of error alleges:
 {¶ 22} "The trial court erred in overruling the defendant's motion for a mistrial based upon the testimony of the state's forensic scientist as to another case in which defendant was a suspect."
 {¶ 23} This argument refers to the state's forensic scientist's response to a question on direct examination. He was being questioned relative to his examination of bullet fragments taken from the scene. The prosecutor was apparently trying to get the witness to explain how the fragments that he examined were consistent with bullets fired from a nine-millimeter handgun. (Tr. Vol. II, p. 372.) In response, the forensic scientist evidently referred to another shooting in which Appellant was a suspect. (Tr. Vol. II, p. 373.) The record provides the following relevant testimony:
 {¶ 24} "Q Okay. Would it be fair to say what you examined and talked about so far is consistent with a 9 millimeter handgun?
 {¶ 25} "A Yes, it's consistent.
 {¶ 26} "Q. Okay. Did you do any other examinations with regards to the case involving Charles Miller and [Appellant]?
 {¶ 27} "A Well, there was a comparison with another case that was submitted to our agency if that is what you're referring to.
 {¶ 28} "Q No. I'm going to — I'm talking about —
 {¶ 29} "[Appellant's counsel]: I'm going to object and ask that that be stricken, Your Honor.
 {¶ 30} "* * *
 {¶ 31} "THE COURT: * * * Overruled." (Tr. Vol. II, pp. 372-375.)
 {¶ 32} While it appears that the prosecutor and defense counsel knew what the forensic scientist was beginning to talk about prior to the objection, it was not clear that his testimony concerned Appellant as a suspect in another shooting.
 {¶ 33} Based on the record before the jury, someone with no knowledge of Appellant's other alleged criminal offense would not have understood the forensic scientist's reference in his testimony. He only mentioned a, "comparison with another case"; he never states that it was another case involving Appellant. As such, this assignment of error lacks merit and is overruled.
 {¶ 34} Appellant's third assignment of error asserts:
 {¶ 35} "The trial court erred in failing to declare a mistrial based upon prosecutorial misconduct."
 {¶ 36} This claimed error centers on the prosecutor's allegedly improper statements in his closing arguments. In apparent response to the defense's closing remarks stating that Appellant is known as a barber and an exotic dancer, the prosecutor stated: "* * * but he goes by some others. He goes by aggravated burglar. He goes by aggravated robber." Defense counsel's objection was sustained. (Tr. Vol. VI, pp. 808-809.)
 {¶ 37} In support of this assigned error, Appellant refers this Court to Maggio v. City of Cleveland (1949), 151 Ohio St. 136, 84 N.E.2d 912, 38 O.O. 578. Maggio involved a personal injury claim where the Supreme Court held that the trial court erred in not granting a mistrial. The Court cited two reasons that, combined, should have caused the trial court to grant a mistrial. First, plaintiff's counsel referenced irrelevant facts during his opening statement. These facts included that the plaintiff had previously suffered nine miscarriages and a graphic description of her husband's unrelated accident that left him institutionalized. Id. at 140. Second, two jurors failed to disclose their immediate family members' personal injury claims during voir dire. Id. at 143-144.
 {¶ 38} Contrary to Appellant's arguments, Maggio is not analogous to the instant matter. The prosecution's reference to Appellant as an aggravated robber and burglar cannot be said to prejudice Appellant's case. The jury was well aware of the charges against him, and had already heard testimony depicting Appellant with a gun threatening Beaver and accosting persons in a parking lot.
 {¶ 39} Appellant claims that the prosecutor's statements in the instant cause were so improper that he should have been granted a mistrial. However, the prosecutor proceeded to another argument after the objection was sustained. (Tr. Vol. IV, p. 809.) Appellant does not identify any other alleged prosecutorial misconduct.
 {¶ 40} Based on the limited nature of the prosecutor's objectionable statement and the court's decision to sustain the objection, Appellant was not denied a fair trial. As such, this assignment of error lacks merit.
 {¶ 41} Going back to the remaining assignments, in Appellant's second assigned error he asserts:
 {¶ 42} "The trial court erred in prohibiting defendant to elicit testimony of witnesses as to his whereabouts at the time of the alleged crimes."
 {¶ 43} In this argument, Appellant claims that the court erred in denying his right to have two apparent alibi witnesses testify at trial.
 {¶ 44} The purpose of pretrial discovery rules, which includes the alibi notice requirement, is to ensure a fair trial for the state and the defendant. State v. Smith (1977), 50 Ohio St.2d 51, 53, 362 N.E.2d 988.
 {¶ 45} Crim.R. 12.1 notice of alibi provides:
 {¶ 46} "Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. * * * If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted."
 {¶ 47} The purpose of the alibi notice requirement is to provide:
 {¶ 48} "`* * * the state some protection against false and fraudulent claims of alibi often presented by the accused so near the close of the trial as to make it quite impossible for the state to ascertain any facts as to the credibility of the witnesses called by the accused.'" State v.Jamison (1990), 49 Ohio St.3d 182, 188, 552 N.E.2d 180, quoting State v.Thayer (1931), 124 Ohio St. 1, 4, 176 N.E. 656.
 {¶ 49} Appellant never filed or served notice of an alleged alibi before trial in compliance with Crim.R. 12.1. In fact, Appellant never disclosed these witnesses as alibi witnesses to his counsel until the day before his jury trial, and Appellant's counsel did not reveal these witnesses as alibi witnesses to the prosecution until the second day of trial. (Tr. Vol. IV, pp. 773-774.)
 {¶ 50} Appellant argues, however, that these witnesses should have been permitted to testify in the interest of justice, and that allowing them to testify would not have prejudiced the prosecution.
 {¶ 51} The Ohio Supreme Court in State v. Smith (1985),17 Ohio St.3d 98, 477 N.E.2d 1128, 17 O.B.R. 219, paragraph two of the syllabus, held that,
 {¶ 52} "Crim.R. 12.1 should be construed liberally and not be applied where no prejudice would accrue to the prosecution, where there is a demonstrable and excusable showing of mere negligence, or where there is good cause shown."
 {¶ 53} Further, the Ohio Supreme Court's State v. Smith opinion in 1985 distinguished its earlier, 1977, State v. Smith opinion on this issue:
 {¶ 54} "In Smith, [in 1977] * * * we held that the trial court abused its discretion by preventing the defendant and his witnesses from proffering alibi evidence. Our holding was based upon the fact that the alibi evidence was not withheld from the prosecution in bad faith, the prosecution was neither surprised nor prejudiced by the offer of proof, and the admission of the evidence was necessary to ensure a fair trial.
 {¶ 55} "We believe that Smith is clearly distinguishable from the case at bar. In this case, the prosecution was unaware of the identity of the alibi witnesses, it had no opportunity or motive to question these witnesses or to investigate the facts, and it would have suffered prejudice by the introduction of alibi testimony. Furthermore, there is some indicia of proof that the alibi evidence was withheld from the prosecution in bad faith, as a planned trial tactic." State v. Smith
(1985), 17 Ohio St.3d 98, 104, 477 N.E.2d 1128, 17 O.B.R. 219.
 {¶ 56} The 1977 version of State v. Smith, 50 Ohio St.2d 51,362 N.E.2d 988, identified three factors to consider when assessing whether the trial court abused its discretion in excluding alibi evidence: First, whether the alibi testimony would surprise or otherwise prejudice the prosecution's case; second, whether the defense was acting in good faith when it failed to give proper notice of the alibi defense; and third whether the admission of the evidence is necessary to insure the defendant a fair trial. Id at 53, 56.
 {¶ 57} Here, it seems evident that Appellant's last-minute disclosure of two possible alibi witnesses surprised the prosecution's case. It is undisputed that the prosecution was not apprised of the alibi nature of these witnesses' testimony until the second day of trial. The prosecution was provided these witnesses' names before trial (without any indication that they may be alibi witnesses) but when the prosecutor tried to contact them prior to trial, they were unavailable. (Tr. Vol. IV, pp. 773-774.)
 {¶ 58} Further, the prosecution's case would undoubtedly have been prejudiced had these witnesses been allowed to testify at trial. The prosecution's trial strategy and preparation could not have included an effort to disprove an alibi defense of which it was unaware. Thus, the first Smith factor supports excluding these alibi witnesses.
 {¶ 59} The second Smith factor concerns whether Appellant failed to give proper notice of his alibi defense in good faith. There is no evidence before this Court that Appellant was acting in good faith. Neither he nor his counsel ever provided a reason for Appellant's delay in revealing his alibi.
 {¶ 60} Unlike the later State v. Smith case, there is no indication in the instant matter that Appellant's counsel withheld the alibi evidence in bad faith or as a planned trial tactic. However, according to his trial counsel, Appellant did not reveal his claimed whereabouts on the night in question until immediately before his trial commenced. There is no indication on the record why Appellant chose until the commencement of his jury trial to disclose an alibi. There is no indication that Appellant's trial counsel requested a continuance when he learned of Appellant's alleged alibi the day before trial. Further, we have no way of knowing why Appellant's counsel delayed communicating information about his alibi to the state. Based on the foregoing, the second Smith factor also supports affirming the trial court's decision to exclude the witnesses.
 {¶ 61} The third and final Smith factor requires that we consider whether the admission of the alibi evidence was necessary to ensure that Appellant received a fair trial. The record before us contains nothing to indicate that Appellant did not receive a fair trial. His case went through the ordinary course of discovery and trial. The overwhelming testimony from both Appellant's accomplices and Beaver placed him at the scene and as an active participant on the night of the offenses.
 {¶ 62} Appellant claims that his alibi witnesses would have established that he was not present at the crime scene on the night of the offense. However, whether Appellant's witnesses would have been consistent and credible is not before this Court.
 {¶ 63} Based on the foregoing, the trial court did not abuse its discretion in applying Crim.R. 12.1 to bar Appellant's witnesses to the instant cause. Appellant clearly did not comply with the rule, and the relevant factors all weigh against admission of this alleged evidence. As such, Appellant's third assigned error lacks merit.
 {¶ 64} In Appellant's fourth assigned error he alleges:
 {¶ 65} "The verdict of the jury was not sustained by the weight of the evidence."
 {¶ 66} "[I]n deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion. A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial. The only special deference given in a manifestweight review attaches to the conclusion reached by the trier of fact." State v. Thompkins (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541, Justice Cook concurring, citing State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 67} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror" and must determine whether the trier of fact, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, supra, at 387,678 N.E.2d 541. A reversal on the basis of the manifest weight of the evidence should only occur in the rare case where the evidence clearly weighs heavily against the conviction. Id.
 {¶ 68} Appellant individually addresses his nine convictions and the accompanying firearm specifications and asserts that each was entered against the manifest weight of the evidence.
 {¶ 69} First Appellant challenges his conviction on the aggravated burglary offense pursuant to R.C. § 2911.11(A)(1) and the accompanying gun specification. This offense arose when Appellant entered Beaver's apartment with a handgun.
 {¶ 70} Aggravated burglary, under R.C. § 2911.11(A)(1), provides:
 {¶ 71} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 {¶ 72} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;"
 {¶ 73} R.C. § 2941.145, the firearm specification, applies if it is specified in the indictment and if the prosecution establishes,
 {¶ 74} "[the] offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."
 {¶ 75} R.C. § 2923.11(B) defines "firearm" as:
 {¶ 76} "(1) * * * any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
 {¶ 77} "(2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."
 {¶ 78} Appellant simply argues that Brown testified Appellant was carrying a shotgun and not the nine-millimeter handgun. She subsequently testified to the contrary. (Tr. Vol. II, pp. 431, 446.) However, a determination as to which specific weapon Appellant was carrying at the time of the offense makes little difference. Further, the testimony reflects that Brown was not in the apartment during this offense.
 {¶ 79} Beaver testified that upon answering her door, someone outside covered the peephole and advised her that they were security agents. She stated that Appellant put his gun through her door; forced his way into her apartment; and was asking for money. Appellant later kicked her when she tried to put on her pants, and slapped her in the face. During this time, Appellant had a gun in his hand. (Tr. Vol. I, pp. 214, 218-221, 230.)
 {¶ 80} Miller's testimony was aligned with Beaver's description of the offense. (Tr. Vol. IV, pp. 589-592.)
 {¶ 81} There is no evidence disputing Miller and Beaver's testimony. The record reflects that Appellant both forcefully and deceitfully entered Beaver's dwelling intent on robbing Gomez. Once inside, Appellant hit and kicked Beaver while wielding a gun. In weighing the evidence produced at trial, there is no indication that the jury clearly lost its way in convicting Appellant of aggravated robbery with a gun specification.
 {¶ 82} Next, Appellant disputes his convictions for felonious assault with firearm specifications as regards Brandi Beaver, Daniel Kenefick, and Raymond Burchfield.
 {¶ 83} R.C. § 2903.11(A) provides:
 {¶ 84} "(A) No person shall knowingly do either of the following:
 {¶ 85} "(1) Cause serious physical harm to another * * *;
 {¶ 86} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 87} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. § 2901.22(B).
 {¶ 88} R.C. § 2923.11(A) defines "deadly weapon" as, "* * * any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."
 {¶ 89} As to the felonious assault on Beaver, Appellant was charged under R.C. § 2903.11(A)(2). This offense concerns Appellant's conduct during the aggravated burglary. As earlier stated, Appellant hit and kicked her, and there is no evidence to the contrary. In addition, upon entering her apartment, Appellant yelled, "Joe, get out here or your girl's going to get it." (Tr. Vol. I, p. 269.) Beaver testified that Appellant was pointing his gun at her while she was searching for money. (Tr. Vol. I, p. 221.)
 {¶ 90} The Ohio Supreme Court has held that the act of pointing a gun at another person in addition to a threat to use the gun is sufficient evidence to convict a defendant of felonious assault under R.C. §2903.11(A)(2). State v. Green (1991), 58 Ohio St.3d 239, 569 N.E.2d 1038. Based on the record here, Appellant's argument in this matter fails.
 {¶ 91} Appellant also disputes his conviction for felonious assault under R.C. § 2903.11(A)(1), with a gun specification for knowingly causing serious physical harm to Kenefick. Kenefick testified that he was shot four times, and two of the bullets were from a handgun. Kenefick's injury is permanent, causing him to walk with a limp. (Tr. Vol. III, pp. 656-658, 681.) Miller testified that Appellant fired his nine-millimeter in Kenefick's direction numerous times. (Tr. Vol. III, pp. 598-599.)
 {¶ 92} In weighing all of the evidence relative to Appellant's conviction as it applies to Kenefick, Appellant clearly knew that injury would occur as a result of firing a handgun toward Kenefick. The record shows that Kenefick was seriously injured. The jury did not lose its way in concluding that the prosecution established this charge beyond a reasonable doubt.
 {¶ 93} Appellant also challenges his convictions for felonious assault with a firearm specification relative to Raymond Burchfield. Kenefick and Burchfield were headed to their borrowed car to leave when shots were fired toward them. The first shot came from behind Kenefick; it was fired from the nine-millimeter. The same weapon likely shot the car's driver's side window and door. (Tr. Vol. III, pp. 661-662, 681.) The car had three bullet holes and fragments that were consistent with handgun ammunition. (Tr. Vol. I, p. 300, Vol. II, pp. 365, 372.)
 {¶ 94} As Miller and Appellant ran out of Beaver's apartment, Appellant was firing his gun. Miller attempted to get into the car driven by Brown. However, Appellant pointed his gun in Miller's face and told him to, "shoot his ass," referring to Kenefick. (Tr. Vol. III, pp. 595, 599.) At that point, Burchfield ran. (Tr. Vol. III, p. 597.)
 {¶ 95} Burchfield was in the same area as Kenefick when Kenefick was shot from behind by a nine-millimeter handgun. Burchfield ducked down before he ran when shots were being fired. (Tr. Vol. I, p. 281.) Even if we could glean from the record that Appellant was not the actual shooter, the trial court instructed the jury on complicity as regards each of the nine counts, which encompasses pressuring, inducing, motivating, or assisting another in committing the offense. (Tr. Vol. IV, pp. 817-818.)
 {¶ 96} Based on the record, there was ample evidence to support the jury's decision to convict Appellant of felonious assault of Burchfield and the accompanying gun specification. Appellant fired his weapon several times toward the two males and their car, and he told Miller to shoot Kenefick.
 {¶ 97} Appellant also argues that he should not have been convicted of the four aggravated robbery offenses under R.C. § 2911.01(A)(1) and the accompanying gun specifications. Appellant's charges stem from conduct toward Beaver, Gomez, Kenefick, and Burchfield.
 {¶ 98} R.C. § 2911.01(A)(1) provides:
 {¶ 99} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 100} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;"
 {¶ 101} As regards Beaver, Appellant argues that because the testimony reflects that Appellant and Miller only intended to rob Gomez, and not Beaver, the evidence does not support a conviction for aggravated robbery against Beaver.
 {¶ 102} Despite Appellant's intended victim, he demanded money from Beaver; threatened her; and pointed a gun at her. There is no evidence to the contrary. Appellant's conviction is supported by overwhelming evidence that Appellant attempted to commit the aggravated robbery of Beaver with a gun.
 {¶ 103} As to that portion of the conviction relative to Gomez, the testimony reveals that Appellant intended to rob Gomez that night. During that attempt, Appellant aimed his gun at Beaver. Further, after Beaver answered the door, Gomez heard a voice tell her to get down, and he heard her crying. Gomez jumped from her apartment window and went to the maintenance shed for help. He glanced back at Beaver's apartment and saw the flash of a handgun toward the apartment. (Tr. Vol. III, pp. 514-516.)
 {¶ 104} Although Gomez was not fully aware at the time of the robbery, the victim's awareness of the offense is not a statutory requirement. Thus, the jury did not lose its way in convicting Appellant of aggravated robbery of Gomez with a firearm specification. The record reflects that Appellant did attempt to rob Gomez while brandishing a weapon.
 {¶ 105} Next Appellant contests his convictions as they relate to Kenefick and Burchfield. In a one paragraph argument, he asserts that there was no attempt to cause harm to Burchfield since Miller was identified as the individual demanding money.
 {¶ 106} However, Miller testified that as he and Appellant were running from Beaver's apartment, Appellant was firing shots. Miller told Kenefick and Burchfield to empty their pockets while they were held at gunpoint. Appellant told Miller to shoot Kenefick, and Kenefick was shot by both Appellant and Miller. (Tr. Vol. III, pp. 595, 597, 653, 656.) Appellant and Miller left the scene together.
 {¶ 107} Based on the foregoing, Appellant participated in the robbery of Kenefick and Burchfield at gunpoint. (Tr. Vol. IV, pp. 817-818.) The jury was instructed as to complicity for each offense. Appellant's actions in firing the handgun toward them plus Miller's demand is sufficient to support the aggravated robbery and firearm specifications. The jury did not lose its way on these counts.
 {¶ 108} Finally, Appellant challenges his conviction for discharging a firearm into Beaver's occupied habitation. R.C. § 2923.161 provides:
 {¶ 109} "(A) No person, without privilege to do so, shall knowingly do any of the following:
 {¶ 110} "(1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual;"
 {¶ 111} Appellant argues that there was no evidence in support of the proposition that he fired a gun into the apartment. He claims that since the handgun he was using that night was never found, the bullet lodged in Beaver's apartment wall could not be linked to him.
 {¶ 112} However, testimony of both Miller and Brown places a nine-millimeter handgun in Appellant's possession on the night in question. Miller saw him firing the gun. Gomez saw a flash from a handgun aimed toward the apartment that night. (Tr. Vol. III, pp. 517-518, 524-525, 529.) The bullet traveled through Beaver's apartment's exterior wall and lodged in her interior wall. (Tr. Vol. IV, p. 707.) The bullet was determined to be consistent with ammunition used in a nine-millimeter handgun. (Tr. Vol. IV, p. 768.)
 {¶ 113} Further, it is undisputed that the apartment was occupied at the time by Beaver and her two sons. Thus, the jury did not clearly lose its way in convicting Appellant of this offense.
 {¶ 114} Based on the foregoing, Appellant's fourth assignment of error lacks merit and is overruled in its entirety.
 {¶ 115} Appellant's fifth assignment of error states:
 {¶ 116} "The trial court erred and abused its discretion by imposing consecutive prison terms amounting to forty-seven years of incarceration in a penal institution."
 {¶ 117} Appellant argues that his consecutive sentences were not justified and that his offenses do not constitute the worst form of any of these offenses in order to warrant maximum jail terms.
 {¶ 118} Appellant was sentenced to a total of 47 years. This sentence was comprised of the ten-year maximum for the aggravated robbery of Beaver; five years for the felonious assault of Beaver; five years each for the aggravated robbery of Beaver and Gomez to be served concurrently; five years for the felonious assault of Burchfield to run concurrently with the eight-year maximum sentence for the felonious assault of Kenefick; five years each to be served concurrently for the aggravated robbery of Burchfield and Kenefick; and five years for shooting into an occupied dwelling. Appellant was also ordered to serve three years each for the gun specifications relative to Beaver, Burchfield, and Kenefick. (Aug. 27, 2003, Tr. pp. 79-87.)
 {¶ 119} Appellant claims that the requisite findings to support imposing consecutive sentences were not justified and that his sentence "pales in comparison" to that of his co-conspirators and another case. Appellant essentially claims that the record does not support the trial court's findings. R.C. § 2953.08(G)(2)(a).
 {¶ 120} Appellant does not argue that the trial court completely failed to make the requisite findings. Notwithstanding Appellant's counsel's oversight,
 {¶ 121} "* * * A court may not impose consecutive sentences for multiple offenses unless it `finds' three statutory factors. R.C.2929.14(E)(4). First, the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. Id. Second, the court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Third, the court mustfind the existence of one of the enumerated circumstances in R.C. 2929.14
(E)(4)(a) through (c)." (Emphasis in original.) State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, ¶ 13.
 {¶ 122} The three R.C. § 2929.14(E)(4) enumerated circumstances are:
 {¶ 123} "(a) The offender committed one or more of the multiple offenses while the offender * * * was under post-release control for a prior offense.
 {¶ 124} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 125} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 126} If the sentencing court does not make the requisite findings, the appellate court, "shall remand the case to the sentencing court and instruct the sentencing court to state, on the record, the required findings." R.C. § 2953.08(G)(1).
 {¶ 127} The trial court made the requisite findings in the instant cause to impose consecutive sentences. However, these findings were only set forth in the trial court's sentencing entry. (August 29, 2003, Judgment Entry of Sentence, pp. 3-4.) This is contrary to the Ohio Supreme Court's recent decision in State v. Comer, supra. Comer held that R.C. § 2929.14(E)(4) and 2929.19(B)(2)(c) require a trial court to make the requisite findings and give reasons supporting those findings at the sentencing hearing before imposing consecutive sentences. Id. at paragraph one of the syllabus.
 {¶ 128} This Court has held that Comer applies to cases that are still pending in the appellate system. State ex rel. Adams v. Krichbaum, 7th Dist. No. 04-MA-108, 2004-Ohio-4286, ¶ 9. Thus, even though Appellant did not directly address it, we must old hat the trial court erred in failing to make the requisite findings on the record. R.C. § 2953.08(G)(1).
 {¶ 129} Appellant also disputes his maximum sentences. Appellant was sentenced to the maximum prison term for the aggravated robbery of Beaver and felonious assault of Kenefick.
 {¶ 130} R.C. § 2929.19(B)(2)(e) requires the trial court to state its reasons for imposing maximum sentences for two or more offenses arising out of a single incident. R.C. § 2929.12(B)-(E) requires a sentencing court to consider enumerated sentencing factors regarding the offender, the offense, and the victim.
 {¶ 131} The trial court's reasons for imposing the maximum sentences are stated in the record in the instant matter. The trial court found that both were the worst forms of these offenses. (Aug. 27, 2003, Tr. pp. 84-85.)
 {¶ 132} As to the aggravated robbery of Beaver, the trial court's reasons included the fact that Appellant was armed; he went to Beaver's apartment with the desire to confront and intimidate the occupants; Appellant hit Beaver; he intended to commit the aggravated robbery in an attempt to take over Gomez's drug territory; and Beaver will likely suffer psychologically for the rest of her life. (Aug. 27, 2003, Tr. pp. 84-85; August 29, 2003, Judgment Entry of Sentence, pp. 2-3.)
 {¶ 133} The trial court's reasons supporting its conclusion that the Kenefick felonious assault was the worst form of the offense included that Appellant wholly lacked remorse; he shot Kenefick for no reason or apparently based on "meanness" or "for fun"; and that Kenefick's injuries were permanent. The trial court also stressed hat Appellant was likely to commit future offenses based on the limited period of time he had been released from prison prior to the commission of these offenses. (Aug. 27, 2003, Tr. pp. 84-85.)
 {¶ 134} It should be noted that one of the court's reasons, specifically, Appellant's attempt to take over Gomez's drug territory, was only made in the trial court's sentencing entry. This is contrary to the Ohio Supreme Court's decision in Comer, supra. Appellant does not identify this error in his appeal.
 {¶ 135} Notwithstanding, the trial court made the requisite and sufficient findings and stated its reasons pursuant to R.C. §2929.19(B)(2)(e). The one reason not in the record contrary to Comer,
supra, does not affect the maximum sentences. As such, the court's decision imposing the maximum prison terms was consistent with law.
 {¶ 136} Based on the foregoing, this assignment of error is overruled in part and sustained in part.
 {¶ 137} Appellant's sixth and final assignment of error asserts:
 {¶ 138} "The trial court erred in its sentencing entry by finding that quentin dillard is a gang affiliated individual who committed these offenses for his own personal benefit as one step in a multi-step process of taking over the local drug trade."
 {¶ 139} Appellant claims that the trial court impermissibly considered Appellant's gang affiliation in sentencing despite the fact that Appellant was acquitted of the gang affiliation specifications.
 {¶ 140} The facts under scrutiny in this assigned error were not presented at Appellant's trial for the underlying offenses. Appellant waived his right to a jury trial on the gang specifications, and those offenses were presented at a bench trial. The trial judge acquitted Appellant of the gang charges because he was unable to conclude beyond a reasonable doubt that Appellant was participating in gang-related business during the commission of the underlying offenses.
 {¶ 141} Notwithstanding Appellant's acquittal on the gang specification, the trial court mentioned that Appellant intended to commit the aggravated robbery in an attempt to take over Gomez's drug territory in its sentencing entry. The trial court does not state that this attempt was part of gang-related activity.
 {¶ 142} Although the trial court's reliance on this aggravating factor was in error, it was only one of several factors given to support the court's sentencing decisions. Further, it is the only finding that was not set forth at the sentencing hearing. (August 29, 2003, Judgment Entry of Sentence, pp. 2-3.)
 {¶ 143} As stated in the previous assignment of error, the trial court listed several reasons in support of its decision to impose the two maximum sentences at the sentencing hearing. The trial court's reference to Appellant's take-over attempt was limited. Thus, this error does not affect the validity of Appellant's sentencing. Appellant's sixth assignment of error is overruled.
 {¶ 144} In conclusion, Appellant's assignments of error concerning the underlying offenses lack merit and his convictions are affirmed. However, the trial court erred in failing to make the requisite statutory findings accompanied by reasons supporting those findings, at Appellant's sentencing hearing concerning the imposition of consecutive sentences. Thus, Appellant's sentence is vacated, and this cause is hereby remanded to the trial court for resentencing according to law and consistent with this Court's Opinion.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.